IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHERYL L. PLEMENS,
     Plaintiff,

vs.                             Case No. 5:06cv80/RS/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## <u>ORDER, REPORT AND RECOMMENDATION</u>

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of Social Security. Therefore, he is automatically substituted as Defendant.  *See* Fed. R. Civ. P. 25(d)(1).

I.     PROCEDURAL HISTORY

        Plaintiff filed her application for DIB on February 8, 2002 (Tr. 58–60).[2] The application was denied initially (Tr. 31, 43-45) and on reconsideration (Tr. 32, 39–41).  On September 15, 2004, following a hearing, an administrative law judge (ALJ) found that Plaintiff was not under a "disability" as defined in the Act at any time when she met the insured status requirements of the law (Tr. 17–25).  On February 6, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4–6). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

        On September 15, 2004, the ALJ made several findings relative to the issues raised in this appeal (Tr. 17–25):

        1)      Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in Section 216(i) of the Act and is insured for benefits through September 30, 2003, the date her insured status expired.

        2)      Plaintiff has not engaged in substantial gainful activity since the alleged onset date of disability (December 14, 2001).[3]

        3)      Plaintiff's fibromyalgia/chronic pain, esophageal reflux, and history of carpal tunnel syndrome and plantar fascia are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).

        4)      These medially determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

        5)      Plaintiff's testimony regarding her limitations is not credible.

        6)      Plaintiff has the following residual functional capacity (RFC): a wide range of light work activity.

_____

        [2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on June 1, 2006 (Doc. 8).

        [3]Thus, the time frame relevant to this appeal is December 14, 2001 (alleged onset) to September 30, 2003 (date last insured).

7)    Plaintiff's past relevant work as a sales associate at a department store did not require the performance of work-related activities precluded by her RFC (20 C.F.R. § 404.1565).

8)    Plaintiff's severe impairments do not prevent her from performing past relevant work (the ALJ specifically found Plaintiff could return to her previous occupation of sales store associate "as it was previously performed and as it is generally performed in the national economy" (Tr. 23)).

9)    Plaintiff was not under a "disability" as defined in the Act, at any time through September 15, 2004, the date of the ALJ's decision (20 C.F.R. § 404.1520(f)).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the

Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must

then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal History

Plaintiff was born on July 9, 1964, and was thirty-nine years (39) old at the time of her hearing before the ALJ (Tr. 129, 444).  She was living with her husband and two children, aged seventeen (17) and nine (9) (Tr. 459).  She has a high school education and obtained an Associate of Arts degree in General Studies during the period under adjudication (Tr. 18, 463).  To obtain her degree, Plaintiff attended school two hours per day, four days per week (Tr. 98).  She graduated cum laude in May 2003, and she intended to go to on to Florida State University (Tr. 63, 410).  Plaintiff has previously worked as a bank teller, bartender, retail sales associate, small press operator, and aide to mentally retarded individuals (Tr. 18, 444).  She claims that her last job was the bank teller job, and she quit that job in either December 1999 or early January 2000 because she was in "a whole lot of pain," tired all of the time, and depressed from being tired (Tr. 445).  Although Plaintiff initially claimed disability beginning on May 31, 1998, she later amended her onset date to December 14, 2001 (see Tr. 18, 80, 442–43).  She alleges disability due to chronic fatigue, depression, and chronic musculoskeletal and joint pain (Tr. 134).  When asked to describe her pain as it existed in 2001, Plaintiff stated that it was "Everywhere.  All throughout my body.  I couldn't move.  I was immobile, on my back most of the time.  I did very little in very small increments." (Tr. 454–55).  As a result, Plaintiff had to lie down most of the day (Tr. 455).  Due to her immobility and inability to socialize, Plaintiff became depressed (id.).  At Plaintiff's hearing in June 2004, she stated she can drive, but she had trouble performing household chores, although she did some housework; she also stated her pain was aggravated by physical activity, and medications have provided only "short-lived" relief (Tr. 456, 458–59, 461–62).  Plaintiff noted that her joints and muscles tighten and she "locks up" unless she takes muscle relaxants and anti-inflammatories (Tr. 459).  She described her depression as "holding steady" with medication, although it affects her ability to concentrate (Tr. 456–57).  She also claims to have panic attacks, but she stated during her hearing that she experiences these now only monthly, whereas before they occurred once or twice a week (Tr. 457–58).

B.      Relevant Medical History[4]

On May 21, 1999, Erin Brewer, M.D., wrote a letter "to whom it may concern" indicating that Plaintiff was a patient from January through April 1999 (Tr. 143).  Dr. Brewer noted that Plaintiff has a prolonged history of myalgia that has worsened "over the past several months" (Tr. 143).  She has pain, but warm weather and Percocet have relieved her pain "somewhat" (*id.*).  Dr. Brewer suspected that Plaintiff had fibromyalgia, but noted that "her physical examination is not perfectly consistent with that diagnosis" (*id.*).

On October 17, 1999, Plaintiff presented to the Gulf Coast Medical Center emergency room complaining of a migraine headache.  She was provided with medication that "almost" completely resolved her headache, and she was discharged (Tr. 202–03).

Plaintiff was a patient of Aracelia Bernier, M.D., F.A.C.F.P., from June 27, 2000 through April 5, 2004 (Tr. 208–47, 414–38).  When Plaintiff first presented, she complained of muscle cramps, muscle pain, and difficulty sleeping (Tr. 246–47).  Dr. Bernier additionally noted that Plaintiff had "depression symptoms," but they were stable on Zoloft (Tr. 244).  Dr. Bernier's initial impression was possible fibromyalgia, and she decided to check Plaintiff's B-12, potassium, and calcium levels; additionally, Plaintiff was prescribed Ambien for insomnia (Tr. 243, 246).  Plaintiff's height was recorded at 5'4.5, and her weight was noted to be 186.5 pounds (Tr. 247).  When Plaintiff returned on July 6, 2000, she indicated she was sleeping better on Ambien, which made her "pain and her days go much better" (Tr. 243).  Dr. Bernier noted that the results of Plaintiff's B-12 and other tests were within normal limits, and Plaintiff was referred to a rheumatologist (*id.*).

Plaintiff returned to Dr. Bernier on September 20, 2000 (Tr. 239).  She reported recently falling after passing out (or nearly passing out), hitting her head, and getting sutures as a result (*id.*).  Dr. Bernier noted that she would order a head CT scan and an EKG; she also planned to order an upper GI series due to Plaintiff's complaint of difficulty swallowing, suggesting a possible hiatal hernia (Tr. 240).  When Plaintiff next saw Dr. Bernier on October 10, 2000, she advised that she did

---

[4]Although the record contains evidence concerning both physical and psychological treatment, most of the psychological reports are not summarized in this report and recommendation, as the ALJ did not find Plaintiff's mental conditions severe (*see* Tr. 19), and Plaintiff has not challenged this finding.  Some psychological evidence is included, however, because it is relevant to Plaintiff's fibromyalgia-related claims.

not get the CT scan because she had no more episodes and decided the scan was not necessary (Tr. 236).  Plaintiff also reported continuing insomnia and severe esophagitis, but the esophagitis was noted to be improving (Tr. 237).  The file also contains notes from office visits on January 31, 2001 (Tr. 234–35) and March 1, 2001 (Tr. 232–33), but the notes are mostly handwritten and difficult to decipher.  However, it appears that Plaintiff complained of gastrointestinal problems (*see* Tr. 234), but did not report any muscle pain or cramping (*see* Tr. 232, 234 (reflecting "negative" signs by the category "MUSCULOSKELETAL: joint pain/swelling/stiffness, cramping")).  Plaintiff apparently reported weight gain in January and fatigue in March (Tr. 234, 232).

Plaintiff returned to Dr. Bernier on March 6, 2001 (Tr. 227).  At that time she reported additional weight gain, and the record reflects Plaintiff's weight at 204.5 pounds (*id.*).  On May 16, 2001, Plaintiff complained of joint pain and fatigue; she weighed 200 pounds (Tr. 225).  Plaintiff continued to report joint pain and fatigue in October and November 2001 (Tr. 223, 224).  The November notes reflect that Plaintiff had recently begun taking Oxycontin and she was "feeling better"; her weight was now at 198 (Tr. 223).  Dr. Bernier's assessment was fibromyalgia, and Plaintiff was advised to find a support group (*id.*).

Plaintiff was seen twice in October 2001 at the office of John M. Szczesny, M.D. (Tr. 248–49).  She reported fatigue, pain, and generalized aches and pains (*id.*).  A decision was made to treat Plaintiff's condition as fibromyalgia, although Plaintiff did not have the amount of tissue tenderness usually seen in such cases (Tr. 248).  Moreover, Plaintiff's lab work was noted to be normal (Tr. 248, 251–52).  Plaintiff was advised to return in two months for follow-up, and the importance of restorative sleep and exercise was emphasized (Tr. 248).  The record contains no indication that Plaintiff ever returned.

On October 31, 2001, Plaintiff was evaluated at the Brain & Spine Center by Kamel Elzawahry, M.D. (Tr. 254–55).  A physical examination of Plaintiff's spine and torso revealed multiple trigger points, consistent with fibromyalgia (Tr. 255).  Dr. Elzawahry's impression was fibromyalgia and chronic fatigue syndrome (*id.*).  Plaintiff was prescribed Oxycontin and advised to return in four weeks (*id.*).  On December 3, 2001, Plaintiff reported a "miserable experience" of pain, discomfort and fatigue when she ran out of Oxycontin, and she reported continued joint pain (Tr. 253).  Although multiple trigger points were again identified, a physical examination of Plaintiff

revealed normal tone, power, coordination and reflexes in both upper and lower extremities, and normal tandem walking, gait, station and base (*id.*).  Plaintiff's Oxycontin was renewed, she was prescribed a stimulant (Provigil), and she was to enroll in the pain clinic (*id.*).

Plaintiff was evaluated and tested at the Mayo Clinic in Jacksonville, Florida by various doctors and specialists between December 2001 and January 2002 (*see* Tr. 256–78).  Plaintiff's chief complaints were "chronic excruciating muscle pain, exhaustion, and poor sleep" (Tr. 270). Although Plaintiff reported that pain medications had not provided any real relief, she admitted that she had not tried physical therapy and does not exercise (Plaintiff noted at one point that she used to walk, but quit in August 2001 due to fatigue) (Tr. 264, 268–69).  In pertinent part, the records reflect a normal and intact muscular examination, symmetric and normal reflexes, and normal deep tendon reflexes (DTRs) in the upper extremities (Tr. 270).  A musculoskeletal examination revealed no "significant tenderness to palpation" except in the bony region over both knees (*id.*).  Although Plaintiff's complaints were consistent with fibromyalgia, and she had been previously diagnosed, it was noted that Plaintiff did not have the "classic tender points," and a possibility existed that she was suffering from some other affliction, although Lupus was ruled out (Tr. 270, 262).  Another physician, however, opined that Plaintiff did have "multiple tender points," but his examination revealed a normal range of motion in the hips, knees, shoulders and elbows, with normal DTRs and normal muscle strength (Tr. 265).  Other physical examinations also found normal range of motion, normal strength, and normal reflexes (*see, e.g.,* Tr. 254).  Plaintiff was also evaluated at the Mayo for foot pain, but an x-ray revealed no abnormalities and the source of her pain was unknown (Tr. 265, 267).  One physician opined that continued use of Oxycontin and Provigil would not be beneficial to Plaintiff (Tr. 271).  A physical therapy program was recommended, as well as possible massage therapy, followed by a fitness program such as bicycling or pool activities (Tr. 264).

Dr. Stephanie L. Hines, an internist at the Mayo Clinic, wrote a letter to Plaintiff dated January 23, 2002, in which she summarized Plaintiff's treatment at the Mayo (Tr. 261–62).  In pertinent part, she indicated that the most likely diagnosis was fibromyalgia, noting that physical therapy and exercise were both recommended (Tr. 261).  Additionally, Dr. Hines summarized the Mayo's laboratory findings as follows: "You have had multiple laboratory tests checked, including an ANA, double stranded DNA, antibodies to extractable nuclear antigens, rheumatoid factor,

sedimentation rate, and serum protein electrophoresis.  These were all within normal limits . . . .
Your chest x-ray was within normal limits.  Your laboratory tests, including a chemistry panel,
complete blood count, liver enzymes, and thyroid function were also within normal limits.  Of note,
your creatinine was mildly elevated at 1.0 (normal range up to 0.9).  This may be related to your
persistent use of nonsteroidal anti-inflammatory medications or potentially to your hematuria"[5, 6]
(Tr. 262).

On April 25, 2002, Plaintiff returned to Dr. Bernier (Tr. 216).  Dr. Bernier reviewed the
records from the Mayo and noted Plaintiff's diagnoses, including fibromyalgia, generalized anxiety
disorder, and hematuria (*id.*).  Plaintiff was started on an antidepressant (trazodone) and a muscle
relaxant and reported "feeling a lot better" and sleeping well, despite some fatigue (*id.*).  Dr. Bernier
reported being "very happy that [Plaintiff] is finally stable and functioning well," and she noted that
Plaintiff's conditions were well controlled (Tr. 216–17).  Plaintiff saw Dr. Bernier in May 2002, but
complained mainly of a sore throat (Tr. 213–15).  Plaintiff next saw Dr. Bernier on September 5,
2002 and was assessed with "fibromyalgia exacerbation" (Tr. 212).  Plaintiff was advised to begin
physical therapy, including water therapy, and her medication was going to be changed from
naproxen to Bextra (*id.*).  Additionally, Dr. Bernier ordered blood testing to check Plaintiff's "sed
rate, ANA, and RA just to be sure [she was] not missing any other possible rheumatological
conditions that were not present at the time of the Mayo Clinic evaluation" (*id.*).  Plaintiff's ANA
test was negative, and her RA and sed rate were within normal limits (Tr. 208–11).  Plaintiff's next
visit was on September 19, 2002 (Tr. 208).  It was noted that Plaintiff had been prescribed Bextra
for pain, and Plaintiff reported that it had "helped well" (*id.*).  Plaintiff had no new symptoms (*id.*).

On or about July 16, 2002, Plaintiff presented to Dr. Kris Lewandowski for a consultative
evaluation based on complaints of continuous pain and weekly headaches.  Dr. Lewandowski's
physical examination of Plaintiff was unremarkable.  He noted that Plaintiff's upper and lower
extremities were "100% mobile on passive and active movement bilaterally," and her muscles were

---

[5]Hematuria is blood in the urine.  *See* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.  (Last visited
February 22, 2007).

[6]A cystoscopy revealed only benign microscopic hematuria, and no further work-up was recommended (Tr.
257).

of normal size and strength (Tr. 280).  Dr. Lewandowski described Plaintiff's neurological evaluation as follows: "no central nervous system deficit.  [DTRs], sensation to touch and pain are normal.  Babinski is negative.  Romberg is negative.  Straight leg raising test is negative.  No resting or intentional tremor." (*id.*).  He described her functional status as follows: "patient appears to be comfortable, she changes position without difficulty, and she bends back to 90 degrees.  She is able to tip toe and heel walk.  She can stand on one extremity with good balance bilaterally.  Grip and manual dexterity are normal." (*id.*).  All range of motion tests (that is, cervical and lumbar spine, shoulders, elbows, wrists, hips, knees and ankles) were within normal limits (Tr. 281).  In relating his impressions, Dr. Lewandowski commented that Plaintiff complained of generalized pain, low energy, and fatigue, but her "physical examination does not reveal any major abnormalities.  There may be somewhat increased texture of her subcutaneous tissue . . . .  Her general functional ability is not impaired in any major degree.  The level of pain is difficult to evaluate objectively." (Tr. 280).

In October 2002, Plaintiff returned to Dr. Bernier with "multiple complaints" (Tr. 426).  Plaintiff was noted to be "obese," and Dr. Bernier discussed with her the "possibility of a significant change in lifestyle" (*id.*).  In November 2002, Dr. Bernier noted that Plaintiff's lab work had been negative "multiple times," and "[t]his time the sed rate, ANA, and RA came back negative once again" (Tr. 425).  Dr. Bernier also noted that Plaintiff had "even had a muscle biopsy and total CK in the past and that came back negative"; thus, she decided to refer Plaintiff to Dr. Tabbaa (*id.*).  Dr. Bernier also noted her recommendation that Plaintiff "consider enrolling in a program that will focus on reconditioning, good nutrition, exercise, and a spiritual strengthening" (*id.*).

Plaintiff was a short-term patient of Dr. Mutaz A. Tabbaa, M.D. (Tr. 335, 391–95).  In November 2002, Dr. Tabbaa noted Plaintiff's ongoing conditions, and additionally noted that Plaintiff  had mild bilateral carpal tunnel syndrome (Tr. 335, 394).  Dr. Tabbaa appeared to concur with the fibromyalgia diagnosis, noting multiple trigger points (*see* Tr. 393–94).  Plaintiff was advised to participate in swimming and cardiovascular exercise (Tr. 395).  Plaintiff saw Dr. Tabbaa again in January 2003, and the office notes are essentially the same, except they note a change in Plaintiff's medication (*see* Tr. 391–92).

In March 2003, Plaintiff underwent a colonoscopy after complaining of rectal bleeding (Tr. 397). The results were in large part unremarkable, but hemorrhoids and Melanosis coli[7] were observed (Tr. 396). Plaintiff was advised to adjust her diet, increase fluid intake, and increase physical activity (*id.*).

In an office note dated April 7, 2003, Dr. Bernier noted that additional sed rate, chemistry, and RA testing from March 2003 again came back "basically" unremarkable (Tr. 422, 419). On November 4, 2003, Dr. Bernier stated that she "agree[d] with the movement to apply for Social Security since [Plaintiff] has been fighting this for at least three years and at this point, due to the symptoms and the multiple medications, she is unemployable" (Tr. 419). Plaintiff was apparently participating in a physical therapy program in November 2003, although she indicated that it exacerbated her pain, and she wanted to discuss with Dr. Bernier the "possibility of low-dose narcotics for treatment" (Tr. 418). Plaintiff was advised to continue physical therapy, but Dr. Bernier did agree to a trial of Percocet (*id.*). Plaintiff reported some benefit from the physical therapy in November and December 2003 (Tr. 416, 417). Dr. Bernier knew of no further recommendations "to do in terms of pain management," and she referred Plaintiff to Dr. Joseph for his opinion (Tr. 417). Finally, in her office note for February 4, 2004, Dr. Bernier noted Plaintiff's report that physical therapy was not providing "a lot of results" (Tr. 415). Her assessment included the following statement: "fibromyalgia, severe, incapacitating at this point. Continue TENS unit. She can discontinue physical therapy if desired. Continue exercising." (Tr. 415).

Plaintiff was a patient of the pain clinic of Northwest Florida from January 29, 2004 through May 11, 2004, where she occasionally saw Robert Joseph, M.D. (Tr. 343–66). When Plaintiff initially reported to the clinic, she filled out a questionnaire (Tr. 360–66). Similar to her earlier reports, she noted pain and fatigue, but this time she indicated it had become worse "to the degree

---

[7]Melanosis coli is a condition usually associated with chronic laxative use in which dark pigment is deposited in the lamina propria (one of the lining layers) of the large intestine (colon). If a person stops using anthranoid laxatives, the changes associated with melanosis coli lessen over time and may disappear. Melanosis coli does not cause symptoms. *See* http://www.medicinenet.com/melanosis_coli/article.htm (Last visited February 25, 2007).

of being immobile" (Tr. 360).  She noted that she had pain everywhere, that movement increased her pain, and she rated her pain as "horrible" or "excruciating" (Tr. 361–62).  She also indicated that pain prevented her from doing activities she used to enjoy (*see* Tr. 366).  Plaintiff was examined by Dr. Joseph on February 9, 2004 (Tr. 348-53).  He noted definite trigger points in and around Plaintiff's neck and at "virtually all of the 18 tender points," but otherwise her examination was unremarkable (Tr. 352).  Dr. Joseph recommended a cervical MRI, but beyond that he really did not know what treatment course to follow, as Plaintiff had already tried the medications he would have recommended, and other treatment options were somewhat controversial and certainly not guaranteed to work (*see* Tr. 353).  On February 25, 2004, Dr. Joseph reviewed the results of Plaintiff's cervical MRI dated February 16, 2004 (Tr. 333, 346).  He noted that the MRI showed a paracentral protrusion at C5-6 consistent with early spinal stenosis and minor spondylosis at C4-5 (*id.*).  He remained unsure of the proper course of treatment and advised Plaintiff to return to the clinic in two weeks (Tr. 346).

On March 30, 2004, Plaintiff returned to the clinic and saw a different doctor (Tr. 345).  This doctor recommended swimming on a regular basis and gradually increasing her activity level (*id.*).  At Plaintiff's request, she was prescribed methadone (one of the controversial treatments (*see* Tr. 353)) on a one-month trial basis (Tr. 345).  On April 13, 2004, Plaintiff's medications were adjusted because she did not like the methadone side effects, and she was started on MS Contin[8] (Tr. 344).  On May 11, 2004, Plaintiff reported that the MS Contin was controlling her pain better without the side effects she experienced with methadone (Tr. 343).  Plaintiff noted that her pain level was in the "moderate range" and that the new medication helped her chronic pain "overall" (*id.*).

C.    Other Information Within Plaintiff's Claim File

On August 9, 2002, a Division of Disability Determinations (DDS) medical consultant found that Plaintiff could lift ten pounds frequently and twenty pounds occasionally; sit, stand, or walk for about six hours in an eight-hour workday; and push or pull without limitation (Tr. 285, 291).  The consultant further found that Plaintiff could occasionally climb, balance, crawl, stoop, kneel, and

---

[8]MS Contin is a time-released formulation of morphine, usually taken every eight hours for chronic pain.  *See* http://en.wikipedia.org/wiki/MS_Contin (Last visited February 23, 2007).

crouch, and she had no manipulative, visual, or communicative limitations, but she should avoid concentrated exposure to temperature extremes (Tr. 286–88).

On November 14, 2002, a second DDS consultant evaluated Plaintiff's physical capacities (Tr. 311–18).  He reached the same conclusions as the first consultant (*see* Tr. 312–15).

Plaintiff was treated by John T. Renick, M.D., a psychiatrist, from October 2, 2002 through December 16, 2003 and from March 16, 2004 through May 19, 2004 (Tr. 390A–390C, 400–13). In general, Plaintiff complained of extreme fatigue, sleeplessness, anxiety, pain, migraines, and numbness and tingling in her legs and feet (*see, e.g.*, Tr. 390C, 402, 407, 409, 410, 412).  She was prescribed various medications, including Neurontin, Percocet, Darvocet, Bextra, Zoloft, Welbutrin, Effexor, baclofen, Topamax, Viagra, and Xanax (*see, e.g.*, Tr. 390C, 403, 405, 407, 409, 413).  In October and December 2003, and in March 2004, Dr. Renick diagnosed Plaintiff with fibromyalgia and "296.33," and he indicated that Plaintiff was "unable to work"[9] (Tr. 390C, 400, 401).  In May 2004, he opined that Plaintiff met Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders)  (Tr. 336–39).

During Plaintiff's hearing, the ALJ questioned her about previous employment in an effort to determine which previous employment constituted substantial gainful employment (SGA) (Tr. 446).  Specifically, the ALJ asked Plaintiff to describe jobs she held for approximately six months, but not to mention part-time jobs or jobs she held for only a short period or where she made little money (*id.*).   In response, Plaintiff identified the following jobs: mentally retarded person's coordinator, which also occasionally included assisting the elderly; bartender; sales associate at Diver's Den; self-employed beauty consultant; small press operator; bank teller; and, after being prompted by her attorney, she identified the job of sales associate, noting that she "worked Alderbeerman [sic] and in the department store, I worked there also as a sales associate" (Tr. 447–53).

---

[9]On each occasion, Dr. Renick completed a form that contained a section entitled "work status for workers compensation patients."  The form contains four options: "unable to work," "able to work"; and, if able to work, "part-time" or "full-time."  In each instance Dr. Renick slected "unable to work," but he did not explain why Plaintiff was unable to work (*see, e.g.*, Tr. 410).

A vocational expert (VE) testified at Plaintiff's hearing (Tr. 463). The VE generally characterized all of Plaintiff's previous employment as semi-skilled, ranging in terms of strength demands from light to medium (Tr. 465). She also acknowledged Plaintiff's three previous sales positions, at Diver's Den, the department store, and as a self-employed beauty consultant (Tr. 465–66). The VE noted that all three sales jobs were light duty, although the job at Diver's Den might have been closer to medium work based upon Plaintiff's description of her job duties (Tr. 466).

## V.   DISCUSSION

Plaintiff generally raises four issues on appeal: 1) the ALJ erred in considering the opinions of Plaintiff's treating physicians regarding her fibromyalgia, 2) erred in his consideration of Plaintiff's subjective complaints, 3) erred in posing a hypothetical question to the VE, and 4) erred in determining that Plaintiff could return to her past relevant work as a sales associate (Doc. 12).

### A.   Opinions of Plaintiff's Treating Physicians/Fibromyalgia

Plaintiff asserts that the ALJ erred in failing to articulate good cause for discrediting the opinions of Dr. Renick and Dr. Bernier, Plaintiff's treating physicians, who each opined that Plaintiff was disabled or "unable to work" (Doc. 12 at 12–17).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See* Wheeler v.

Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e). The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims. The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner. For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion. Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance"). Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the

entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis, 125 F.3d at 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

Dr. Renick was Plaintiff's treating psychiatrist.  His office notes reflect an opinion that Plaintiff was "unable to work."  Additionally, he separately opined that Plaintiff met the criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders).  Despite Dr. Renick's opinions regarding Plaintiff's mental disorders, the ALJ found that Plaintiff had no severe mental disorder, and Plaintiff has not challenged this finding.  Instead, Plaintiff argues that the ALJ should have fully accepted Dr. Renick's opinion that Plaintiff was unable to work due to fibromyalgia (see Doc. 12 at 12–13, 15–16), as well as the similar opinion of Dr. Bernier.  Plaintiff argues that the

"sole reason for discrediting the opinions of these physicians is the lack of objective findings" supporting the fibromyalgia diagnosis (Doc. 12 at 16).

The diagnosis of fibromyalgia is difficult because the disease often lacks medical or laboratory signs and is generally diagnosed mostly on an individual's described symptoms. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). Thus, the Seventh Circuit has held that requiring positive laboratory findings is error in cases of this nature. Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996) (ALJ erred in finding claimant non-disabled because of lack of positive laboratory tests) (cited approvingly in Stewart v. Apfel, 245 F.3d 793 (11th Cir. 2001) (table), 2000 U.S. App. LEXIS 33214 (unpublished opinion)). In Stewart, the court reviewed medical research on fibromyalgia, noting that it often lacks medical or laboratory signs, is generally diagnosed mostly on an individual's described symptoms, and its hallmark is a lack of objective evidence. Thus, the ALJ's determination that a fibromyalgia claimant's testimony was incredible, based on the lack of objective evidence documenting the impairment, was reversed. Stewart, 245 F.3d at 793, 2000 U.S. App. LEXIS 33214, at *9, n.4. See also Moore, 405 F.3d at 1211 (reiterating the impropriety of focusing on the absence of objective findings corroborating claims of the impairment).

Other Circuits that have considered the issue have found that fibromyalgia is a disease that can serve as the basis for a medically determinable impairment, even without positive laboratory findings. See, e.g., Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); Preston v. Secretary of Health & Human Servs., 854 F.2d 815, 817–18 (6th Cir. 1988) ("Fibrositis [now fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances," and diagnosis involves testing for focal tender points.) Indeed, the Commissioner has instructed that in cases of chronic fatigue syndrome, a condition that, like fibromyalgia, is based largely on self-reported symptoms, "[p]ersistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points" is an example of a medical sign that establishes the existence of a medically determinable impairment. Social Security Ruling 99-2p, 1999 WL 271569 (1999).

In the instant case, contrary to Plaintiff's assertion, the ALJ did not rely on a lack of objective findings to discredit the physicians' opinions. Indeed, the ALJ fully accepted the

opinions—insofar as the diagnosis of fibromyalgia is concerned, because he found that Plaintiff had fibromyalgia <u>and</u> that it was severe impairment.  The ALJ stopped short of fully accepting their opinions because he found that Plaintiff could return to her past work as a sales associate.

In support, the ALJ noted that the treatment notes of Dr. Renick and Dr. Bernier, "as well as other medical evidence," do not support their opinions of "debilitating limitations" (Tr. 23).  The ALJ first noted that Plaintiff's laboratory tests were within normal limits (Tr. 23).  Although this could be interpreted as a comment on the lack of objective evidence, the ALJ is not concluding that the test results suggest Plaintiff did <u>not</u> have the disease; he is pointing out that the disease did not limit her as severely as she claims.  The lab work ruled out any other cause for Plaintiff's pain, and it is obvious from a review of Dr. Bernier's notes that she found the lab results very important.  Moreover, the ALJ provided additional justification for discounting their opinions.  He noted Dr. Hine's letter, which confirmed the fibromyalgia diagnosis and specifically recommended physical therapy and exercise (Tr. 23).  Of note, the letter was written after Plaintiff had a battery of tests and extensive examinations by numerous physicians and specialists at the Mayo Clinic, and the conclusion was that Plaintiff was capable of exercise and physical therapy.  Other physicians also recommended physical activity, including Dr. Szczesny, Dr. Bernier, Dr. Tabbaa, and a physician at the Northwest Florida pain clinic.  The ALJ also noted Dr. Lewandowski's physical examination of Plaintiff, which revealed no major abnormalities (Tr. 23).  As discussed *supra*, Dr. Lewandowski reported 100% mobile movement of Plaintiff's arms and legs, and her muscles were of normal size and strength.  Additionally, DTRs, straight leg raising, and sensation to touch and pain were normal.  Plaintiff appeared comfortable during the examination and changed position without difficulty.  She could bend backwards to 90 degrees, tip toe and heel walk, and stand on either leg with good balance.  Her grip and manual dexterity were normal, as well as all of her range of motion tests.  Other physical examinations yielded similar results, including those conducted by Dr. Elzawahry and at the Mayo Clinic.

Finally, regarding Dr. Renick's opinion, the court notes that Dr. Renick is a psychiatrist, but he opined that Plaintiff was disabled, in part, on the basis of a physical condition.  Title 20 C.F.R. § 404.1527(d)(5) provides that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."

Thus, Dr. Renick's opinion regarding Plaintiff's fibromyalgia was entitled to less weight.  The court further notes that Dr. Bernier's opinion was rendered on November 4, 2003, but Plaintiff was last insured on September 30, 2003.  Dr. Bernier specifically stated that she "agree[d] with the movement to apply for Social Security since [Plaintiff] has been fighting this for at least three years and <u>at this point</u>, due to the symptoms and the multiple medications, she is unemployable" (Tr. 419) (emphasis added).

   Nevertheless, because the ALJ articulated specific reasons for discounting the opinions of Plaintiff's treating physicians, and those reasons have substantial support in the record, the ALJ did not err.

   B.  Analysis of Plaintiff's Subjective Complaints

   Plaintiff alleges the ALJ improperly minimized her subjective symptoms of pain and fatigue (Doc. 12 at 17–22).

   As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In <u>Hand v. Heckler</u>, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

   The Eleventh Circuit continues to follow the <u>Hand</u> test.  <u>Wilson v. Barnhart</u>, 284 F.3d 1219 (11th Cir. 2002); <u>Kelley v. Apfel</u>, 173 F.3d 814 (11th Cir. 1999); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216 (11th Cir. 1991); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Martin v. Railroad Retirement Bd.</u>, 935 F.2d 230, 233 (11th Cir. 1991).

   The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part

standard." <u>Wilson</u>, *supra*, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the <u>Hand</u> standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." <u>Elam</u>, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992) (citing <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[I]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." <u>MacGregor v. Bowen</u>, 786 F.2d at 1054; <u>Holt v. Sullivan</u>, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. <u>Jones v. Department of Health & Human Servs.</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[10]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.

---

[10]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  <u>Bonner v. Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

"Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, *supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In discounting Plaintiff's subjective complaints of pain, the ALJ specifically noted that Plaintiff drives a car, washes dishes, and does the laundry (Tr. 22).  Indeed, Plaintiff testified that she drove, including driving to all of her doctors' appointments (Tr. 461–62).  She also indicated that she vacuums and picks up, although her son takes the trash out (Tr. 461).  She also testified that she "tries" to do the laundry, but when she does she is "down for three days" (*id.*).  Plaintiff further testified that her husband is disabled, so they share some household duties, including cooking (Tr. 460–61).  Although Plaintiff's descriptions of her activities show some limitations, the ALJ is not required to believe all of a claimant's assertions concerning her activities.  *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Furthermore, the ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms.  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(I).

The ALJ also noted that Plaintiff attended college and graduated cum laude with a 3.51 grade point average during the period under adjudication (Tr. 22).  Moreover, Plaintiff stated that she attended classes four days per week.  The ALJ also noted that the DDS psychological consultants observed that Plaintiff was attending college and raising three children at the time (Tr. 22; *see also* Tr. 282, 304, 331).  The court notes that in addition to driving to her many doctors' appointments, Plaintiff was also traveling to the Wal-Mart Super Center on Panama City Beach to have her many prescriptions filled (*see* Tr. 462).  The total amount of Plaintiff's activity is certainly inconsistent with her allegations of disabling pain.

Finally, the ALJ noted (as he did in the treating physician analysis) that Plaintiff's laboratory tests were all normal and Dr. Lewandownski's physical examination revealed no abnormalities.

The ALJ articulated his reasons for discounting Plaintiff's allegations of disabling pain, and his reasons have substantial support in the record.  Thus, the ALJ did not err.

C.   Hypothetical Questions

Plaintiff contends the ALJ erred in questioning the VE because he failed to include Plaintiff's subjective complaints of pain and fatigue (Doc. 12 at 17).

A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported.  See McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).  Because the ALJ properly rejected Plaintiff's subjective complaints, he was not requited to include them in his questions of the VE; thus, he did not err in this regard.

D.   Plaintiff's Past Relevant Work

Finally, Plaintiff contends the ALJ erred in concluding that Plaintiff could return to her past relevant work as a sales associate because Plaintiff did not hold this job long enough for it to constitute "substantial gainful employment" (SGA) (Doc. 12 at 20–21).

In order to constitute past relevant work, the work must have been done within the prior fifteen years, lasted long enough for the claimant to learn to do it, and the job must have been performed at the substantial gainful activity level.  See 20 C.F.R. § 404.1565(a) (2006).  See also Lauer v. Bowen, 818 F.2d 636, 639 (7th Cir. 1987) (to be considered past relevant work, a claimant's previous work must "rise to the level of substantial gainful activity"); Vaughn v. Heckler, 727 F.2d 1040, 1042 (11th Cir. 1984) (past work must be substantial to qualify for disability benefits); Melville v. Apfel, 198 F.3d 45, 53 (2nd Cir. 1999) (a claimant's past work experience, especially part-time work, is not relevant unless, inter alia, it was substantial gainful activity); Roberts v. Apfel, 27 F. Supp.2d 1295, 1299 (N.D. Ala. 1998) (the ability to do previous work will not establish disability unless that previous work was itself substantial and gainful).  "Substantial gainful activity" is defined as work that "(a) [I]nvolves doing significant and productive physical

or mental duties, and (b) [I]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  Federal regulations further provide:

> Substantial gainful activity is work activity that is both substantial and gainful:
> (a) Substantial work activity.  Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
> (b) Gainful work activity.  Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized . . . .

20 C.F.R. § 404.1572.

In the instant case, the ALJ specifically asked Plaintiff to describe the jobs she previously held for approximately six months, but not to mention part-time jobs or jobs she held for only a short period or where she made little money (Tr. 446).  In response, among other jobs, Plaintiff identified the sales job at Alderbeerman department store, even though she now claims it was not SGA.  Nonetheless, the earnings information from "Elder Beerman" shows that Plaintiff earned only $200.80 in 1989 at this job (Tr. 52, 448).  Thus, that job may or may not constitute past relevant work as defined by the Regulations.  However, even if it does not, any error by the ALJ in this regard is harmless.  Plaintiff held other sales associate jobs, including her job at Diver's Den, which had similar duties and constituted SGA (*see* Tr. 54 (reflecting earnings in 1995 at $3,754.00)).  Although Plaintiff could not return to the Diver's Den job because it required heavier lifting than a department store sales job, she held the sales jobs in total "long enough to learn to do them," especially considering Plaintiff's intellect.  *See* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements by ALJ harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant);  *see also* East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard).

Moreover, although it may not be clear that Plaintiff performed the job identified by the ALJ at the SGA level, the ALJ also found that Plaintiff retained the RFC "to perform a wide range of

light work on a regular and continuing basis" (Tr. 22).  The Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.00 state that the ability to perform a "wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competencies for unskilled work."  *See also* Social Security Ruling (SSR) 85-15.  Thus, considering Plaintiff's age, education, and work experience, the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.27, direct a finding of "not disabled" and support the ALJ's conclusion (Tr. 22).  Therefore, even if the ALJ erred, any error is harmless because sufficient evidence exist to support his finding nonetheless.

In sum, as noted by the Seventh Circuit, "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, 'Fibromyalgia Syndrome (ABC of Rheumatology),' 310 British Med.J. 386 (1995); Preston, 854 F.2d at 818, but most do not and the question is whether [Plaintiff] is one of the minority." Sarchet, 78 F.3d at 307 (emphasis added).  In the instant case, the record supports the ALJ's conclusion that Plaintiff is not one of the minority, and her fibromyalgia is not disabling.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Michael J. Astrue is substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED,** that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 27<u>th</u> day of February 2007.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**